**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**Jamie Caprita,**

       **Plaintiff,**

   **v.**                    **Civil Action 2:22-cv-3324**

                               **Magistrate Judge Kimberly A. Jolson**

**Trent Dunaway, et al.**

       **Defendants.**

<u>**OPINION AND ORDER SETTING TRIAL DATE**</u>

Before the Court is Defendants' Motion for Summary Judgment (Doc. 70).  For the following reasons, the Motion is **GRANTED in part and DENIED in part**.  The Court **SETS** this case for trial on March 18, 2025, at 9:00 AM.

**I.**    **BACKGROUND**

This matter concerns Plaintiff Jamie Caprita's treatment while he was in custody at Belmont County Jail in St. Clairsville, Ohio.  (Doc. 2 (Plaintiff's complaint)).  He sues Belmont County Sheriff's Deputies Trent Dunaway, Thomas Updegraff, and Michael Ardeno; Belmont County Sheriff David Lucas; and the Belmont Board of County Commissioners ("the Board").  (*Id.*).  Plaintiff originally brought this case in the Belmont County Common Pleas Court, and then Defendants removed it to federal court.  (*See* Doc. 1).  The parties subsequently consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c).  (Docs. 5, 9).

Plaintiff was jailed at Belmont County Jail between August 6 and August 11, 2021.  (Doc. 69 at 9; Doc. 57 at 10).  Defendants Dunaway, Updegraff, and Ardeno were all employees of the jail during that time.  (Doc. 57 at 4).  Most of the events at issue in this action occurred on August 6 and August 7.

Plaintiff arrived at the jail on August 6.  The parties' accounts of what happened during Plaintiff's booking process differ.  Plaintiff says that Defendant Dunaway was one of the booking officers.  (Doc. 69 at 14).  Sometime during or after the booking process, Dunaway pushed him against a wall and threatened him for "informing" against the Martins Ferry Police Department. (*Id.* at 16; *see also id.* at 13).  Additionally, upon booking, Dunaway "didn't fill out [Plaintiff's] medical paperwork," resulting in some of Plaintiff's medical needs being ignored.  (*Id.* at 9, 15, 28–30 (Plaintiff's testimony he was denied certain prescribed medications and medical meals)). For his part, Dunaway contends that he was not involved in Plaintiff's booking process.  (Doc. 60 at 13).

The parties' accounts of what happened the next day also vary, but cameras caught some of the action.  (*See generally* Docs. 58, 59, 60, 62, 69, 78).  In Plaintiff's version of events, he went to breakfast in his jail block on the morning of August 7 and sat by himself under a set of stairs. (Doc. 69 at 23).  While he was still under the stairs, another inmate named Brandon Hehle "started walking toward [Plaintiff] like he was going to fight."  (*Id.*).  Both Dunaway and Ardeno were present and witnessed Hehle's movements.  (*Id.*).  Ardeno tackled and handcuffed Helhe while Dunaway did the same to Plaintiff.  (*Id.* at 23–24).  In the process of handcuffing him, Dunaway jumped on Plaintiff, put a knee in his back to handcuff him, lifted him by his arms, and continued to pull on his arms.  (*Id.* at 24).  As Dunaway escorted him out of the block, Plaintiff screamed that Dunaway was hurting him.  (*Id.*).

Updegraff then met them in a hallway that overlooks a recreation yard.  (*Id.* at 24–25). Updegraff somehow gained control of Plaintiff and slammed him into a wall.  (*Id.* at 25).  Next, with Dunaway still restraining him, Updegraff choked Plaintiff, to the point that he blacked out.

(*Id.*). Dunaway and Updegraff then slammed Plaintiff on the ground. (*Id.* at 25, 32). While he was still laying unconscious on the ground, Updegraff punched him in the face. (*Id.* at 32).

Plaintiff asserts he did not "wake back up" until the officers lifted him to his feet. (*Id.* at 25). The officers escorted Plaintiff back to his cell and threw him in. (*Id.*). Dunaway and Ardeno returned a little later to bring Plaintiff to the nurse's station. (*Id.* at 26 ("They didn't escort me [to the nurse's station], they violently took me to the nurse's office.")). Once there, Plaintiff believes the nurse measured his oxygen levels and blood pressure. (*Id.*). Plaintiff asked to be taken to the hospital, but the nurse denied his request. (*Id.*). Then, Dunaway and Ardeno escorted him back to the cell block with his arms at an "almost 90 [degree angle]." (*Id.*; *see also id.* at 32).

Defendants tell a different story. On the morning of August 7, Defendants say Idora Kimbro, a corrections officer, assisted with breakfast in Plaintiff's jail block. (Doc. 62 at 7). Viewing the block from behind a glass door, Kimbro heard Plaintiff arguing with another inmate and using racial slurs. (*Id.* at 8–9). Then, Plaintiff asked Kimbro to bring him breakfast. When she refused, Plaintiff called her a racial slur. (*Id.* at 9–10; *see also* Doc. 60 at 14). Kimbro then saw a "guy in the corner [of the block] jump up[.]" (Doc. 62 at 9; *see also* Doc. 60 at 17)). Kimbro signaled for backup. (Doc. 62 at 9–10). Ardeno and Dunaway responded and entered the block. (Doc. 60 at 13–14; Doc. 62 at 10–11). At that point, Plaintiff was yelling, demanding to go to the hospital, and threatening to hit an officer. (Doc. 60 at 14). Dunaway attempted to calm Plaintiff down, but then Hehle aggressively "went after" Plaintiff. (*Id.* at 16). Ardeno stopped Hehle by performing a takedown maneuver and placing him in handcuffs. (*Id.*). At the same time, Dunaway put Plaintiff in handcuffs. (*Id.* at 17, 19, 31).

Dunaway then escorted Plaintiff out of the block and down a hallway where they met Updegraff. (*Id.* at 19–20; *see also* Doc. 59 at 12). At that point, Plaintiff resisted the escort and

3

went "deadweight." (Doc. 59 at 15, 18; Doc. 60 at 20–23). Updegraff held him against a wall and told him to stand up on his own. (Doc. 59 at 19). When he didn't, Updegraff and Dunaway let go of Plaintiff, and he fell to the floor. (*Id.* at 19–20; Doc. 60 at 20–23). While Plaintiff was on the ground, Updegraff hit Plaintiff's shoulder to get him to focus on Updegraff's commands. (Doc. 59 at 20). After getting him back on his feet, Dunaway and Ardeno returned Plaintiff to his cell. (Doc. 58 at 13; Doc. 59 at 20; Doc. 60 at 22). A short time later, Dunaway and Ardeno took Plaintiff to the medical office, where the nurse concluded Plaintiff was uninjured. (Doc. 58 at 14; Doc. 60 at 24–25).

Subsequently, Updegraff completed a use of force report. (*See* Doc. 57-1 at 13–15; *see also* Doc. 73-1). After Lieutenant Jarrett Weeks reviewed the report and footage of the incident, he concluded that the use of force by Updegraff was "questionable." (*Id.* at 2). He also issued discipline to Updegraff, Dunaway, and Ardeno because none utilized their body cameras though "there was ample time to activate them[.]" (*Id.*; *see generally* Doc. 63). Defendant Lucas reviewed Weeks's report, as well as the video footage and statements from Updegraff, Dunaway, and Ardeno. (Doc. 73-2 at 1; *see generally* Doc. 57). Ultimately, Lucas concluded that Updegraff violated the jail's use of force policy. (Doc. 73-2 at 3). Lucas issued Updegraff a 32-hour suspension and required him to complete anger management counseling. (*Id.* at 4).

Plaintiff was released from custody on August 11. (Doc. 69 at 18). At the time of his release, a form was signed with Plaintiff's name attesting that he was not injured during his stay. (*Id.*; *see* Doc. 67-3 at 3). Plaintiff contends the signature is forged. (Doc. 69 at 18). After his release, Plaintiff went to the emergency room, where his doctor listed his diagnoses as: "chest pain, unspecified type"; "multiple contusions"; and "injury of head, initial encounter." (Doc. 67-5 at 4; *see also* Doc. 69 at 32–33 (Plaintiff's testimony his eye, shoulder, arms, ribs, and toe were bruised,

and he dislocated his shoulder)). Plaintiff left the emergency room against medical advice, as he was "only . . . there to document injuries." (Doc. 69 at 34; *see* Doc. 67-5 at 7). Plaintiff says that he continues to experience physical distress and the exacerbation of pre-existing psychological ailments as a result of his treatment at the jail. (*See, e.g.*, Doc. 69 at 30–32, 35; *see also* Doc. 67-6 at 17 (medical records related to Plaintiff's admittance to the hospital on August 12 for "acute psychosis")). He also asserts that the denial of his medications and medical meals resulted in unhealthy weight loss. (Doc. 69 at 29).

Plaintiff brings claims for violations of his rights under the Fourth and Fourteenth Amendments of the United States Constitution under 42 U.S.C. § 1983, and state-law claims for the intentional infliction of emotional distress, assault, and battery. (Doc. 2 at ¶¶ 10–11 18–19, 21–23, 25). Plaintiff also alleges Defendants Dunaway, Updegraff, and Ardeno's actions are imputed on Defendants Lucas and the Board because the officers' actions were committed while they were within the course and scope of their employment. (*Id.* at ¶¶ 8, 20; *see* Doc. 73 at 19–20). As relief, Plaintiff seeks compensatory damages, punitive damages, attorney's fees, and costs. (Doc. 2 at 5).

Defendants seek summary judgment on all claims. (Doc. 70). This matter is ripe for review. (Docs. 73, 74).

## II. STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial "responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record that demonstrate "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts

to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  Evidence is viewed in the light most favorable to the nonmoving party, meaning that "any direct evidence offered by the [nonmovant] in response to a summary judgment motion must be accepted as true."  *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004) (citing *Liberty Lobby*, 477 U.S. at 251–52, and *Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994)).  Ultimately, the Court asks "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Liberty Lobby*, 477 U.S. at 251–52.

## III.  DISCUSSION

Plaintiff brings claims for violation of his federal constitutional rights under 42 U.S.C. § 1983, as well as the intentional infliction of emotional distress, assault, and battery.  To establish a prima facie claim under § 1983, a plaintiff must satisfy two elements: (1) that defendants acted under color of state law, and (2) that defendants deprived plaintiff of a federal statutory or constitutional right.  *See, e.g.*, *Flagg Bros. v. Brooks*, 436 U.S. 149, 155 (1978); *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994); *United of Omaha Life Ins. Co. v. Solomon*, 960 F.2d 31, 33 (6th Cir. 1992) (per curiam).  Defendants' Motion for Summary Judgment does not challenge the first element for his federal claims.  So, the Court considers whether Defendants deprived Plaintiff of his constitutional rights in addition to considering Plaintiff's state law claims.

### A.  Fourteenth Amendment Excessive Force Claims

Defendants argue they are entitled to summary judgment on Plaintiff's claims that Defendants Dunaway, Updegraff, and Ardeno used excessive force at various times on August 7. (Docs. 70, 72).

6

As a threshold matter, Plaintiff's complaint alleges violations of the Fourth and Fourteenth Amendment for subjecting Plaintiff to the unlawful and excessive use of force. (Doc. 2 at ¶¶ 18–19). Yet his response to Defendant's summary judgment motion also places his claims within the scope of the Eighth Amendment. (*See* Doc. 73 at 9–16). As discussed below, because Plaintiff was a pretrial detainee at the time of these events, the Fourteenth Amendment's due process clause is what applies here. *See Kingsley v. Hendrickson*, 576 U.S. 389, 396–400 (2015) ("The language of the [Eight Amendment's cruel and unusual punishment clause and the Fourteenth Amendment's due process clause] differ[], and the nature of the claims often differs. And, most importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'"); *Hale v. Boyle Cnty.*, 18 F.4th 845, 852 (6th Cir. 2021) (explaining detained individuals bring excessive force claims under the Fourteenth Amendment, and those claims are analyzed under an objective standard rather than the Eight Amendment's objective–subjective standard); *Begley v. Tyree*, No. 17-5001, 2018 WL 3244508, at *2 (6th Cir. Feb. 13, 2018) ("Although Begley, as a pre-trial detainee at the time of the events in question, was not entitled to the direct protections of the Eighth Amendment, he was entitled to the same protections under the Fourteenth Amendment's Due Process Clause."). The Court considers Plaintiff's arguments but under the proper standard.

"A Section 1983 claim brought by a pretrial detainee against an officer for using excessive force in violation of the Fourteenth Amendment requires that the pretrial detainee ([the] plaintiff) show 'that the force purposely or knowingly used against him was objectively unreasonable.'" *Washington v. Miami Cnty.*, No. 3:20-CV-173, 2022 WL 17326436, at *13 (S.D. Ohio Nov. 29, 2022) (quoting *Kingsley*, 576 U.S. at 396–97)); *see also Brawner v. Scott Cnty.*, 14 F.4th 585, 592 (6th Cir. 2021). Whether the use of force was objectively unreasonable, "turns on the 'facts and

circumstances of each particular case.'" *Kingsley*, 576 U.S. at 397 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The Supreme Court instructs that "[a] court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* And courts must account for the "'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* (citing *Bell v. Wolfish*, 441 U.S. 520, 540, 547 (1979)) (alterations in original).

In determining the reasonableness or unreasonableness of force, courts consider factors such as:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.* Yet, in the end, courts should consider any relevant circumstance that may bear on the type of forced used. *Id.* For example, while potentially relevant to the reasonableness analysis, an officer's "alleged departure from a local policy is not determinative." *Ayala-Rosales v. Teal*, 659 F. App'x 316, 321 (6th Cir. 2016).

As with other constitutional violations, even if a plaintiff were to establish that an officer used excessive force on a pretrial detainee in violation of the Fourteenth Amendment, the officer may still enjoy immunity. "Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Taylor v. Riojas*, 592 U.S. 7, 8 (2020) (citation omitted); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar

as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.").  Relevant here, "[a]t the summary judgment stage, qualified immunity does not apply if the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that (1) an officer's conduct violated a plaintiff's constitutional rights, and (2) the right was clearly established and one of which a reasonable officer would have known." *Osborn v. City of Columbus*, No. 22-3570, 2023 WL 2523307, at *3 (6th Cir. Mar. 15, 2023) (citation omitted).  "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)).  "The contours of the [violated] right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

Plaintiff's complaint alleges Defendants used excessive force in violation of his rights three times: (1) when Dunaway handcuffed Plaintiff; (2) when Dunaway and Ardeno escorted Plaintiff in a manner that lifted his hands and arms; and (3) when Dunaway, Updegraff, and Ardeno choked, beat, and threw Plaintiff to the ground during the escort through the jail hallway.  (*See generally* Doc. 2).  Defendants seek summary judgment in connection to each and additionally argue they are entitled to qualified immunity.  (Docs. 70, 74).

### 1. Handcuffing

Plaintiff alleges Defendants "handcuffed [Plaintiff's] hands behind his back in such a manner as to constitute the use of excessive force."  (Doc. 2 at ¶ 13).

Defendants first respond that neither Updegraff nor Ardeno were personally involved in the handcuffing.  (Doc. 70 at 7–8).  The Sixth Circuit has held that "[t]o establish personal liability

under § 1983, it must be shown that the official acted to 'cause[ ] the deprivation of a [federal] right.'" *Reed-Bey v. Pramstaller*, 607 F. App'x 445 (6th Cir. 2015) (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)) (alterations in original); *Murphy v. Grenier*, 406 F. App'x 972, 974 (6th Cir. 2011) ("Personal involvement is necessary to establish section 1983 liability."). Plaintiff's response to the summary judgment motion does not address Defendants' personal liability arguments. (*See generally* Doc. 73). Even so, testimony from both sides reflects that Defendant Dunaway placed Plaintiff in handcuffs. (Doc. 58 at 9; Doc. 60 at 17, 19; Doc. 69 at 23–24). Video footage shows the same. (Doc. 78, video "21-5685-7 a" at 3:40–4:25). Because Plaintiff has not offered any evidence that either Updegraff or Ardeno were personally involved in Plaintiff's handcuffing, they are entitled to summary judgment.

There is no dispute, however, that Defendant Dunaway handcuffed Plaintiff after his interaction with inmate Hehle. (*See, e.g.*, Doc. 60 at 17, 19, 31; Doc. 69 at 23–25). Video footage shows Plaintiff was sitting down under a set of stairs when Hehle walked towards him. (Doc. 78, video "21-5685-7 a" at 3:30). Plaintiff contends that he hadn't talked to Hehle since he arrived at the jail and didn't know why Hehle would be trying to fight him. (Doc. 69 at 24). Contrarily, Ardeno and Dunaway testified that Plaintiff and Hehle were arguing. (Doc. 58 at 8; Doc. 60 at 17). Regardless, when Hehle was a few feet away from Plaintiff, Ardeno and Dunaway entered the block. (Doc. 78, video "21-5685-7 a" at 3:38). Ardeno tackled Hehle, and Dunaway walked toward Plaintiff, who was still sitting. (*Id.*). Dunaway felt "it was best at the time for everybody's safety to place [Plaintiff] in handcuffs" because "[Plaintiff] was still actively arguing with Inmate [Hehle]." (Doc. 60 at 19). Exactly what happened next is difficult to see because the stairs block Plaintiff and Dunaway's finer movements. (Doc. 78, video "21-5685-7 a" at 3:42). But Plaintiff testified that in the process of restraining him, Dunaway "jumped on" him, tackled him, and "put

10

[a] knee in [his] back[.]" (Doc. 69 at 24). For his part, Dunaway stated that he approached Plaintiff, put his hand on his shoulder, and told him to turn around and "cuff up." (Doc. 60 at 17).

Ultimately, the force Dunaway used to handcuff Plaintiff was not objectively unreasonable. Crediting Plaintiff's account, Plaintiff was not resisting and was sitting at the time Dunaway "tackled" and handcuffed him. (Doc. 69 at 24). This could demonstrate that the force used was disproportionate to the need for force to restrain Plaintiff, and Plaintiff asserted Dunaway did not ask him to stand up before cuffing him, which potentially could have tempered the force used. (*Id.*). But the undisputed facts support a perceived security risk because of Hehle and Plaintiff's interaction. Though Plaintiff now asserts "there was no disturbance that required him to be handcuffed in the first place," (Doc. 73 at 14; *id.* at 3 ("No altercation occurred. [Plaintiff] never even spoke to [Hehle]")), video footage clearly shows Hehle walking toward Plaintiff. (Doc. 78, video "21-5685-7 a" at 3:30). And everyone agrees that Hehle displayed some level of hostility toward Plaintiff. (Doc. 60 at 16 (Dunaway's testimony that he observed Hehle walking "aggressively" towards Plaintiff with "his fists balled"); Doc. 69 at 23–24 (Plaintiff's testimony that "[Hehle] got up and started walking toward me like he was going to fight" and that Hehle was "coming at" him)). Ardeno and Dunaway reacted to this situation by placing both Hehle and Plaintiff in handcuffs.

In this scenario, the Court defers to Dunaway's decision to handcuff Plaintiff in diffusing the situation (and the force he used while doing so). The Sixth Circuit has held that this deference is generally appropriate when officials use force in connection to a prison disturbance:

> [O]fficials confronted with a prison disturbance must balance the threat [that] unrest poses to inmates, prison workers, administrators, and visitors against the harm inmates may suffer if guards use force. Because prison officials must make their decisions in haste, under pressure, and frequently without the luxury of a second chance, we must grant them wide-ranging deference in the adoption and execution

11

> of policies and practices that in their judgment are needed to preserve internal order
> and discipline and to maintain institutional security.

*Griffin v. Hardrick*, 604 F.3d 949, 954 (6th Cir. 2010) (considering an excessive force claim under the Eighth Amendment) (citation omitted); *see Ayala-Rosales*, 659 F. App'x at 321 (applying *Griffin* to a pretrial detainee's Fourteenth Amendment excessive force claim). And even if true that Dunaway used some force during the process of handcuffing Plaintiff, by jumping on him or putting a knee in his back, there is no record evidence that the force was more than necessary to properly secure Plaintiff. Even if Plaintiff subjectively believes that Dunaway could have secured him differently, his "perception of what lesser force might have been employed by the Defendant in the heat of the moment . . . does not reflect the applicable constitutional standard." *Johnston v. Hamilton Cnty. Just. Ctr.*, No. 1:18-CV-864, 2021 WL 1250955, at *15 (S.D. Ohio Apr. 5, 2021), *report and recommendation adopted*, No. 1:18-CV-864, 2022 WL 4554117 (S.D. Ohio Sept. 28, 2022). Notably, Plaintiff does not attribute any of his injuries to the manner in which he was handcuffed, including from Dunaway tackling him or putting a knee in his back. For these reasons, Plaintiff has failed to raise a genuine issue of material fact that Dunaway's decision to restrain Plaintiff in light of a disturbance in the jail block was objectionably unreasonable.

Even if the force Dunaway used to restrain Plaintiff was objectively unreasonable, the Court finds that Dunaway is entitled to qualified immunity on this claim. Since Dunaway has raised the qualified immunity defense, Plaintiff bears the burden of showing that he is not entitled to qualified immunity. *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015) (quoting *Reilly v. Vadlamudi*, 680 F.3d 617, 623 (6th Cir. 2012)). As previously stated, this requires Plaintiff to raise a genuine issue of material fact that Dunaway violated a constitutional right that was clearly established. *Osborn*, 2023 WL 2523307, at *3. "To show that the official violated a 'clearly established' right, the plaintiff must 'define with specificity the clearly established legal rule that

the officers allegedly violated.'" *Paul v. Whitley Cnty. Det. Ctr.*, 712 F. Supp. 3d 907, 920 (E.D. Ky. 2024) (quoting *Gambrel v. Knox Cnty.*, 25 F.4th 391, 400 (6th Cir. 2022)), *aff'd sub nom. Paul v. Whitley Cnty., KY, Det. Ctr.*, No. 24-5142, 2024 WL 4362260 (6th Cir. Sept. 30, 2024); *see also Gambrel*, 25 F.4th at 400 ("A case can provide the required notice only if it 'clearly established' that the force was excessive, placing the issue 'beyond debate' and making the officers 'plainly incompetent' in thinking otherwise.") (citation omitted).

In response to Defendant's claim to qualified immunity, Plaintiff cites no case law that would tend to show Dunaway violated Plaintiff's clearly established right to not be handcuffed like he was. True, Plaintiff cites a handful of cases in more generally arguing his excessive force claim that he says have similar fact patterns. But none put forth a legal principle that has a "sufficiently clear foundation in then-existing precedent" relevant to the manner in which Plaintiff was restrained. *Moderwell v. Cuyahoga Cnty.*, No. 20-3879, 997 F.3d 653, 660 (6th Cir. May 12, 2021) (citation omitted); (*see* Doc. 73 (citing *Osborn v. City of Columbus*, No. 22-3570, 2023 WL 2523307, at *3 (6th Cir. Mar. 15, 2023); *Perry v. Erdos*, No. 1:22-CV-178, 2024 WL 3461219 (S.D. Ohio Jan. 30, 2024), *report and recommendation adopted in part, rejected in part*, No. 1:22-CV-178, 2024 WL 3912381 (S.D. Ohio Aug. 21, 2024); *Standifer v. City of Columbus*, No. 2:19-CV-3803, 2022 WL 279038 (S.D. Ohio Jan. 31, 2022); *Alspaugh v. McConnell*, 643 F.3d 162 (6th Cir. 2011) (considering force applied after an inmate was already restrained on the floor and remanding the issue to the district court))).

Other cases supplied by Defendants clearly establish that putting "substantial or significant pressure" on a plaintiff's back when they are facedown after being subdued or incapacitated constitutes excessive force. *See, e.g.*, *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004); *Martin v. City of Broadview Heights*, 712 F.3d 951, 961 (6th Cir. 2013) ("*Champion*

13

proscribes the use of 'substantial or significant pressure' that creates asphyxiating conditions in order to restrain a subject who does not pose a material danger to the officers or others."). Here, Plaintiff alleges that Dunaway "put his knee in [Plaintiff's] back" while Plaintiff was seated as part of the handcuffing process—not after he was facedown and subdued. (Doc. 69 at 24). In short, Plaintiff has not met his burden to raise any genuine issue of material fact that would overcome Dunaway's qualified immunity defense.

Accordingly, concerning Plaintiff's claims of excessive force connected with the manner in which Plaintiff was handcuffed, the Court **GRANTS** summary judgment to Dunaway, Updegraff, and Ardeno.

### 2. Escort Positions

The Court now turns to Plaintiff's allegation that Defendants "improperly lifted on Plaintiff's hands with unnecessary and excessive force." (Doc. 2 at ¶ 15). Once again, Defendants assert that Updegraff had no personal involvement. (Doc. 70 at 7–8). Video footage and testimony support this assertion. (*See, e.g.*, Doc. 58 at 9–10, 13–15; Doc. 60 at 17, 19–23, 31; Doc. 69 at 24–26; Doc. 78, video "21-5685-7 a" at 3:40–4:25; video "21-5685-7 c" at 0:08–0:15; video "21-5685-7 d" at 0:05–1:10; video "21-5685-7 k" at 2:00–2:15; video "21-5685-7 r" at 0:01–0:15). Therefore, Updegraff cannot be held liable for this claim.

In contrast, there is no dispute that both Dunaway and Ardeno escorted Plaintiff around the jail. Plaintiff first attests that Dunaway "lifted [him] up by [his] arms" directly after he was handcuffed and "was really pulling on [his] arms" as Dunaway escorted him out of the block into the hallway. (Doc. 69 at 24). Video footage shows Dunaway bringing Plaintiff to his feet by holding onto Plaintiff's arms. (Doc. 78, video "21-5685-7 a" at 4:16). As he does, Plaintiff's feet slip a couple times before he is able to stand. (*Id.*). Then Dunaway escorts him out of the block

with both hands holding onto Plaintiff's arms.  (*Id.* at 4:21).  Plaintiff's arms are hiked up, his upper arms parallel to the ground.  (*Id.*; *see also id.* video "21-5685-7 b" at 3:46).  Dunaway continues this two-hand escort after the pair leave the block.  (*See, e.g.*, Doc. 78, video "21-5685-7 c" at 0:08; video "21-5685-7 d" at 0:09).  Plaintiff said he was "screaming in pain" during the escort because Dunaway "was pulling on [his] arm so bad."  (Doc. 69 at 24).  He told Dunaway, "[Y]ou're hurting me," multiple times.  (*Id.*).  The video footage does not have audio, so this assertion is not contradicted or corroborated.

The Court concludes that there is a genuine issue of material fact as to whether Dunaway applied excessive force during this escort.  Defendants argue that Dunaway's actions of pulling Plaintiff off the ground by his arms and moving him out of the block deserve deference because at that point, he was still responding to the disturbance between Plaintiff and Hehle.  (Doc. 70 at 9–10).  Yet as the escort progressed, the pair became increasingly removed in terms of both time and space from that disturbance.  By all accounts, Ardeno secured Hehle and moved him away from Plaintiff.  (Doc. 58 at 9–10; Doc. 60 at 19–20; Doc. 69 at 24).  And Dunaway escorted Plaintiff out of the jail block, away from other inmates.  (Doc. 78, video "21-5685-7 b" at 3:46; video "21-5685-7 c" at 0:08; video "21-5685-7 d" at 0:09).  Nonetheless, according to Plaintiff, the pressure on his arms and shoulders remained so great, he screamed in pain and told Dunaway that he was hurting him.  (Doc. 69 at 24).  Plaintiff contends in his response brief that the escort position dislocated his shoulder, but his deposition testimony directly contradicts this.  (*Compare* Doc. 73 at 4 (asserting Plaintiff's shoulder was dislocated as a result of Dunaway's and Ardeno's escort) *with* Doc. 69 at 32 (Plaintiff's testimony that his shoulder was injured and dislocated after he was "slam[med]" to the floor)).  Regardless, if Plaintiff experienced intense physical pain, that is enough.  *See Evans v. Plummer*, 687 F. App'x 434, 441 (6th Cir. 2017) ("[T]he unreasonable

infliction of 'intense physical pain' is sufficient to give rise to an excessive-force claim; there is no requirement that the excessive force cause a permanent or visible injury."); (*see also* Doc. 69 at 32 (Plaintiff's testimony that the way Defendants "kept dragging [him] up and down the hallway" exacerbated his shoulder pain)). And though Dunaway suggests that Plaintiff was pulling him, Plaintiff says the opposite. (*Compare* Doc. Doc. 60 at 20 *with* Doc. 69 at 24). Consequently, from these facts, a jury could find that Dunaway used objectively unreasonable force in escorting Plaintiff out of the block and through the jail.

Similarly, Plaintiff also claims that later when Ardeno and Dunaway escorted him back to his cell after his medical visit, they had his "hands so far up, [Plaintiff was] walking down the hallway [at] almost 90 degrees." (Doc. 69 at 26). Footage shows Ardeno and Dunaway escorting Plaintiff with their arms positioned under Plaintiff's elbows and their hands on his shoulders. (*See, e.g.*, Doc. 78, video "21-5685-7 n" at 5:43; video "21-5685-7 p" at 0:10; video "21-5685-7 q" at 0:05; video "21-5685-7 r" at 0:01). At times, Plaintiff walks forward while bending at the waist. (*See, e.g.*, Doc. 78, video "21-5685-7 p" at 0:10; video "21-5685-7 q" at 0:05)). Once again, his arms are hiked up, with his upper arms parallel to the ground. (*Id.*).

The Court concludes that a genuine issue of material fact exists as to whether Dunaway and Ardeno used objectively unreasonable force in escorting Plaintiff back to his cell. There is no contention that when the officers escorted Plaintiff away from medical that there was a prison disturbance or security threat requiring them to escort Plaintiff with his upper arms parallel to the ground. There is also nothing in the record to suggest that Plaintiff was resisting the escort. Even so, the Court considers that Dunaway claims he tempered any force he applied by "settl[ing]" his arms and not applying pressure. (Doc. 60 at 26 (Dunaway's testimony that handcuff position was "normal procedure"), 32). But the video footage is not dispositive as to the amount of pressure

Dunaway and Ardeno applied. Indeed, at various points, Plaintiff bends at the waist during the escort with his arms in the air. (*See, e.g.*, Doc. 78, video "21-5685-7 p" at 0:10; video "21-5685-7 q" at 0:05). Though Ardeno testified that Plaintiff "chose to" walk like that (Doc. 58 at 15), Plaintiff asserts they were dragging him (Doc. 69 at 32). And Plaintiff testified that the escort position exacerbated his shoulder pain. (Doc. 69 at 32); *see Evans*, 687 F. App'x at 440–41. All things considered, a jury could conclude that the officers' escort position inflicted unnecessary pain on Plaintiff, and the pressure they exerted on his shoulders and arms was objectively unreasonable.

Qualified immunity is not appropriate right now for either Defendant because this claim turns on fact determinations and video footage interpretations. *See Baynes v. Cleland*, 799 F.3d 600, 610 (6th Cir. 2015) ("The issue of qualified immunity may be submitted to a jury only if 'the legal question of immunity is completely dependent upon which view of the [disputed] facts is accepted by the jury.'") (citation omitted). What's more, there is sufficient caselaw surrounding using force that inflicts unreasonable pain or pain for no penological purpose to give Dunaway and Ardeno "'fair warning' that [their] actions were unconstitutional" if a jury were to believe Plaintiff's version of events. *Goodwin v. City of Painesville*, 781 F.3d 314, 325 (6th Cir. 2015); *see, e.g.*, *Evans*, 687 F. App'x at 440–41 (upholding a district court's determination that a reasonable jury could conclude that a defendant continued to inflict unreasonable pain when the plaintiff told him that the way she was handcuffed caused her arms and wrists to be in pain); *Graham*, 490 U.S. at 395 n.10 ("It is clear, however, that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment.").

In sum, concerning any allegations of excessive force connected with the manner in which Plaintiff was escorted, the Court **GRANTS** summary judgment to Updegraff but **DENIES** the same for Dunaway and Ardeno.

### 3.    Hallway Incident

Next, the Court considers Plaintiff's allegations of excessive force in the jail hallway after Dunaway escorted him out of the jail block.  Video footage shows Ardeno escorting Hehle through a door and down the hallway before Dunaway enters the hall escorting Plaintiff.  (Doc. 78, video "21-5685-7 d" at 0:05).  Updegraff meets the latter pair about halfway down the hallway. Updegraff's hands make contact with Plaintiff's shoulder, and Plaintiff's head and torso appear to hit the hallway wall.  (*Id.* at 0:12).  Plaintiff describes this as Updegraff "slam[ing]" him off the wall.  (Doc. 69 at 25).  Then Plaintiff steps backwards and sideways, and Updegraff joins Dunaway in holding one of Plaintiff's arms.  (Doc. 78, video "21-5685-7 d" at 0:14).  Next, the officers walk Plaintiff, still restrained, to a set of windows that run along the opposite wall.  (*Id.* at 0:16).

The camera angle obscures some of what comes next.  It appears that Updegraff and Dunaway either hold or attempt to hold Plaintiff face-first against the windows.  (*Id.* at 0:16–0:30). But Plaintiff is out of the camera's view.  Plaintiff says that Updegraff choked him while Dunaway held him.  (Doc. 69 at 25).  Plaintiff contends he blacked out "six [or] seven times" from the chokehold.  (*Id.*).  For his part, Updegraff denies he used a chokehold on Plaintiff.  Rather, he says he held Plaintiff against the wall to speak with him.  (Doc. 59 at 18–19; *see also* Doc. 60 at 23 (Dunaway's testimony he held Plaintiff against the wall "[s]o he didn't fall down . . . [b]ecause he's handcuffed, and he was throwing himself around previously")).  After about fifteen seconds, Updegraff steps back, bringing Plaintiff back within the camera's view.  (Doc. 78, video "21-5685-7 d" at 0:30).  At least one of Updegraff's arms is up around Plaintiff's neck area, and Dunaway's

hands are on Plaintiff's upper body. (*Id.*). Next, both officers let go of Plaintiff, and he drops to the floor. (*Id.*). Though Plaintiff says he was not conscious at this point, he contends Updegraff and Dunaway "slammed" him to the ground. (Doc. 69 at 25). Updegraff and Dunaway say they merely allowed Plaintiff to fall because Plaintiff went "deadweight." (Doc. 59 at 19; Doc. 60 at 23–24).

At this point, Ardeno reenters the scene. (Doc. 78, video "21-5685-7 d" at 0:31). Ardeno and Dunaway stand over Plaintiff, who lays on his back, and Updegraff walks several steps away. (*Id.*). After a few seconds, Updegraff walks back to stand over Plaintiff too. (*Id.* at 0:50). He leans down. Then his right hand makes contact with Plaintiff, though the extent of this action cannot be seen on the video because Updegraff's body blocks it. (*Id.*). Updegraff says he hit Plaintiff on the shoulder to get his attention. (Doc. 59 at 20). Though, again, Plaintiff says he was still unconscious at the time, he contends Updegraff punched him in the left eye based on his injuries. (Doc. 69 at 32). Dunaway and Ardeno then bring Plaintiff up off the ground and escort him out of the hallway. (Doc. 78, video "21-5685-7 d" at 1:00).

Like with the handcuffing claim, Defendants argue that Ardeno is entitled to summary judgment because he was not personally involved. The Court agrees. The video evidence clearly shows Ardeno participated only in getting Plaintiff up off the ground and escorting him out of the hallway. *See Hanson v. Madison Cnty. Det. Ctr.*, 736 F. App'x 521, 527 (6th Cir. 2018) (quoting *Green v. Throckmorton*, 681 F.3d 853, 859 (6th Cir. 2012)) ("Where, as here, there is 'a videotape capturing the events in question,' the court must 'view those facts in the light depicted by the videotape.'" (cleaned up)).

Updegraff and Dunaway's use of force is a different matter. There are three allegations of force that the Court considers: (1) Updegraff choking Plaintiff; (2) Updegraff and Dunaway

slamming or throwing Plaintiff to the ground; (3) and Updegraff hitting or punching Plaintiff once he is down on the ground. Ultimately, the Court finds a genuine issue of material fact as to whether both Defendants used objectively unreasonable force.

In considering the relevant factors, Dunaway and Updegraff testified that Plaintiff was resisting throughout this encounter by being verbally threatening and noncompliant and eventually going "deadweight." (*See* Doc. 59 at 12, 15, 17, 19; Doc. 60 at 22). But Updegraff conceded that at that time, Plaintiff was unable to carry out any threats he was making because he was physically restrained. (Doc. 59 at 12, 17; *see also* Doc. 73-2 (disciplinary report finding Plaintiff "posed no physical threat to those in the immediate area of the hallway at the time.")). And the video footage clearly shows that Plaintiff's arms were in handcuffs and behind his back at all times. At any rate, choking a detainee—which is deadly force—is disproportional to verbal or passive resistance. *See Coley v. Lucas Cnty.*, 799 F.3d 530, 541 (6th Cir. 2015) ("Chokeholds are objectively unreasonable where an individual is already restrained or there is no danger to others.") (citations omitted); *see also Degolia v. Kenton Cnty.*, 381 F. Supp. 3d 740, 763 (E.D. Ky. 2019) ("The Sixth Circuit has long held that 'mere noncompliance is not active resistance.'" (citation omitted)) (collecting cases). What's more, crediting Plaintiff's account, he could not have resisted when Dunaway and Updegraff held him against the wall because he blacked out from Updegraff's chokehold. (Doc. 69 at 25). The video footage shows he was not physically resisting after he fell to the floor. (Doc. 78, video "21-5685-7 d" at 0:32). So, the same disproportionality is true if, as Plaintiff asserts, either Defendant threw him to the floor or Updegraff struck him while he was handcuffed, laying prone on the ground. *Cf. Schreiber v. Moe*, 596 F.3d 323, 332 (6th Cir. 2010) (noting that under the Fourth Amendment, "striking a neutralized suspect who is secured by handcuffs is objectively unreasonable") (collecting cases).

The Court also considers that Plaintiff alleges various injuries from this encounter. *See Olmetti v. Kent Cnty.*, No. 22-1834, 2023 WL 3868654, at *5 (6th Cir. June 7, 2023) (collecting cases that excessive force can exist even where the physical contact did not "leave excessive marks or cause extensive physical damage" (citation omitted)). In particular, Plaintiff says his shoulder was injured, and possibly became dislocated, when Updegraff and Dunaway slammed him to the floor. (Doc. 69 at 32). He also testified to neck pain and bruises and supplied medical records from August 11 documenting bruising. (*Id.*; *see* Doc. 67-5).

And though not dispositive of the issue, in reviewing Updegraff's use of force, Defendant Lucas found that he had violated jail policy by physically intervening in Plaintiff's escort and reacting with "an unreasonable level of force towards [Plaintiff]." (Doc. 57-1 at 4–5; *see also* Doc. 57 at 5–6). In making his findings, Lucas considered that Updegraff's actions "were driven at least in part by [his] anger, including [his] anger due to [Plaintiff's] non-violent threats of stating that he would get corrections officers fired as well as his action of going limp while [Updegraff was] restraining him." (Doc. 57-1 at 6). Using force out of anger, rather than out of a penological need, is objectively unreasonable. *See Coley*, 799 F.3d at 541 ("It is a constitutional violation for law enforcement officials to use violent physical force 'totally without penological justification.'" (citation omitted)); *see also Beavers v. Harrison*, No. 1:23-CV-10204, 2024 WL 3739666, at *8 (E.D. Mich. June 10, 2024) (citing *J.H. v. Williamson Cnty.*, 951 F.3d 709, 717–719 (6th Cir. 2020)) ("The Fourteenth Amendment's Due Process Clause protects pretrial detainees from all forms of 'punishment' . . . And punishment may be inferred whenever a government official injures a pretrial detainee either in an 'excessive' response to a legitimate objective or without rationally furthering a legitimate government interest at all."), *report and recommendation adopted*, No. 1:23-CV-10204, 2024 WL 3292817 (E.D. Mich. July 3, 2024).

21

In considering the balance of these factors, the Court concludes that Plaintiff has raised a genuine issue of material fact as to whether Updegraff and Dunaway violated his Fourteenth Amendment right to be free from excessive force. Additionally, the Sixth Circuit has held "where the video does not tell the whole story in a material respect, or 'reasonable jurors could interpret the video evidence differently,' summary judgment is not appropriate." *Hanson*, 736 F. App'x at 527 (quoting *Green*, 681 F.3d at 865). Importantly, the parties' differing accounts of what happened while Plaintiff is out of view of the camera is crucial to this claim. A reasonable jury could believe Plaintiff's version of events or Updegraff and Dunaway's narration. At the end of the day, it is a credibility determination that is best left for a jury.

The Court acknowledges that there are more allegations that pertain to Updegraff than to Dunaway. For one, Plaintiff admits that Dunaway did not choke him, and the video footage shows Dunaway did not use force against Plaintiff after he was on the ground. And the use of force report signed off by Defendant Lucas only considered Updegraff's part in the altercation. But, contrary to Defendants' argument that Dunaway played no role in the hallway incident, Plaintiff alleges that Dunaway took part in throwing him to the ground after he passed out. The video footage is not dispositive of the amount of force Dunaway applied as Plaintiff dropped to the ground—that is, whether Plaintiff's assertion that he was "slammed" to the ground or Dunaway's assertion that he simply let go of Plaintiff is correct. A reasonable jury could interpret the video evidence differently. For this reason, summary judgment is not appropriate.

Lastly, neither Defendant is entitled to qualified immunity now. Ultimately, the question of immunity depends on which version of the facts a jury would believe. *Baynes*, 799 F.3d at 610 ("The issue of qualified immunity may be submitted to a jury only if 'the legal question of immunity is completely dependent upon which view of the [disputed] facts is accepted by the

jury.'") (citation omitted).  There is sufficient caselaw about choking restrained plaintiffs or using force for no penological purpose to give Updegraff and Dunaway "'fair warning' that [their] actions were unconstitutional" if a jury were to believe Plaintiff's version of events.  *Goodwin,* 781 F.3d at 325; *see, e.g., Coley,* 799 F.3d at 541 ("The use of a chokehold on an unresisting— and even an initially resistant—detainee violates the Fourteenth Amendment."); *Graham,* 490 U.S. at 395 n.10 ("It is clear, however, that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment."); *cf. Degolia,* 381 F. Supp. 3d at 767–69 (E.D. Ky. 2019) ("[G]rabbing [the plaintiff] in a chokehold, throwing him to the ground, and striking him in the face at least six times when [the plaintiff] posed no threat to safety or security and offered no form of active resistance—'violates [the plaintiff's constitutional] right' to be free from excessive force.").

Consequently, the Court **GRANTS** Ardeno summary judgment on this claim but **DENIES** the same for Dunaway and Updegraff.

## B.    Fourteenth Amendment Deliberate Indifference Claim

Defendants next seek summary judgment on Plaintiff's claim that they were deliberately indifferent to his medical needs.  "Pretrial detainees have a right to adequate medical care under the Fourteenth Amendment . . . . An officer violates that right if that officer shows 'deliberate indifference to [a pretrial detainee's] serious medical needs.'"  *Hyman v. Lewis,* 27 F.4th 1233, 1237 (6th Cir. 2022) (citing *City of Revere v. Mass. Gen. Hosp.,* 463 U.S. 239, 244 (1983) and *Greene v. Crawford Cnty.,* 22 F.4th 593, 605 (6th Cir. 2022)).  In *Brawner v. Scott County,* the Sixth Circuit held that to succeed on this claim, the Plaintiff must show:

> (1) that [he] had an objectively serious medical need; and (2) that [Defendant's] action (or lack of action) was intentional (not accidental) and [Defendant] either (a) acted intentionally to ignore [his] serious medical need, or (b) recklessly failed to act reasonably to mitigate the risk the serious medical need posed to [him], even

> though a reasonable official in [Defendant's] position would have known that the
> serious medical need posed an excessive risk to [his] health or safety.

14 F.4th 585, 597 (6th Cir. 2021). "Stated differently, a pretrial detainee must have a serious
medical need, and the defendant must act, whether through intentional action or omission,
recklessly in response to the need and the risk it presented to the detainee." *Grote v. Kenton Cnty.*,
85 F.4th 397, 405 (6th Cir. 2023).

Plaintiff's complaint alleges two circumstances when Defendant failed to provide him with
proper medical care: (1) after the use of force incident; and (2) when he was not given medication
and meals necessary for the maintenance of his health. (Doc. 2 at ¶¶ 16, 23). Up front, the Court
notes that Plaintiff's response to Defendants' Motion for Summary Judgment presents little to
rebut Defendants' arguments on these claims. (*See generally* Doc. 73); *cf. Gannon v. Medina
Twp.*, No. 1:21CV601, 2022 WL 3028095, at *16 (N.D. Ohio Aug. 1, 2022) (finding claims
abandoned when a plaintiff did not address certain arguments in his opposition brief). It merely
alleges that Plaintiff was denied medical attention and medication as factual background. (*Id.* at
1–4). Still, the Court considers each circumstance briefly.

### 1. After Use of Force

Defendants first seek summary judgment as it relates to Plaintiff's treatment after the use
of force incident in the jail hallway described above. (Doc. 70 at 11–13). It is uncontested that a
nurse at the jail evaluated Plaintiff. (*See* Doc. 70 at 12; Doc. 73 at 4; *see also* Doc. 78, video "21-
5685-7 o" (footage of Plaintiff's visit to medical)). Plaintiff asserts that at this evaluation, he told
her he was choked, was having trouble breathing, had back and neck problems, and possibly about
his congestive heart failure. (Doc. 69 at 26 (Plaintiff's response that "I have congestive heart
failure and stuff" after being asked if he told the nurse he wanted to go to the hospital)). Plaintiff

believes the nurse measured his oxygen levels and took his blood pressure. (*Id.*). Then officers returned him to his cell, but Plaintiff says he needed more care. (Doc. 73 at 4).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). "Where a prisoner alleges only that the medical care he received was inadequate, 'federal courts are generally reluctant to second guess medical judgments.'" *Alspaugh*, 643 F.3d at 169 (quoting *Westlake*, 537 F.2d at 860 n.5). Medical treatment must be "so woefully inadequate as to amount to no treatment at all," to be considered deliberately indifferent. *Id.* "Mere negligence is not enough to support a deliberate indifference claim." *Francis v. Roberts*, No. 1:22-CV-743, 2023 WL 3370229, at *2 (S.D. Ohio May 11, 2023) (citing *Brawner*, 14 F.4th at 596).

The jail nurse who examined Plaintiff is not a defendant in this lawsuit. As to the named defendants, Defendants argue Plaintiff cannot show on these circumstances that Dunaway, Updegraff, and Ardeno either ignored a serious medical need or reacted recklessly in response to the need and the risk it presented to Plaintiff. (Doc. 70). The Court agrees.

Plaintiff does little to defend this claim in his opposition to the motion for summary judgment beyond citing his testimony that he has pre-existing medical problems and wanted to go to the hospital. (*See* Doc. 73 at 4). It is uncontested that Dunaway and Ardeno took Plaintiff to be examined by medical staff after the use of force incident in the hallway. So, they did not fail to act reasonably to mitigate any objectively serious medical need. And ultimately, Plaintiff has failed to raise a genuine issue of material fact that his medical treatment was so woefully inadequate as to amount to no treatment at all. Indeed, Plaintiff sought emergency room care after his release from the jail, but only to document his injuries. And he left before receiving any

treatment. (*See* Doc. 69 at 33–34 (Plaintiff's testimony that he left the emergency room contrary to medical advice because his purpose in going was to document his injuries); *see also* Doc. 67-5 at 11–12 (August 11 emergency room notes diagnosing Plaintiff with chest pain (unspecified type), multiple contusions, and injury of head (initial encounter); reading x-rays and CT scans as normal; and noting that Plaintiff left the hospital against medical advice)).

Still more, the Sixth Circuit has held that "generally, 'non-medically trained officer[s]' do not act with deliberate indifference to a detainee's medical needs when they reasonably defer to a medical professional's diagnosis or treatment." *Grote*, 85 F.4th at 412 (citing *McGaw v. Sevier Cnty.*, 715 F. App'x 495, 498 (6th Cir. 2017)). That deference can be unreasonable if an officer "is aware of additional information concerning an incarcerated person's condition or if the medical professional rendered their opinion prior to the changed circumstances." *Id.* But that is not the case here. Dunaway and Ardeno took Plaintiff to be evaluated by the nurse following the use of force incident, and Updegraff was present during the evaluation. (Doc. 60 at 24; Doc. 69 at 26; *see generally* Doc. 78, video "21-5685-7 o"). Plaintiff told the nurse he wanted to go to the hospital. (Doc. 69 at 26). But evidently, she disagreed. Plaintiff makes no argument that Defendants should have disregarded the nurse's evaluation that Plaintiff did not need further treatment at a hospital. For example, there is no evidence that Plaintiff had a medical need that an untrained eye should have recognized. And as previously stated, Plaintiff presents no argument why Dunaway, Updegraff, or Ardeno otherwise recklessly failed to act reasonably to mitigate the risk of a serious medical need posed to Plaintiff. The Court concludes it was reasonable for the officers to defer to the jail nurse's judgment. Therefore, the Court **GRANTS** Dunaway, Ardeno, and Updegraff summary judgment on this claim.

### 2. *Medication and Meals*

Defendants also seek summary judgment on Plaintiff's claim that "Defendants were advised that Plaintiff was on medication, which was necessary for maintenance of his health, but [Defendants] refused to provide said medication to Plaintiff." (Doc. 2 at ¶ 23). Again, Plaintiff offers little to respond to Defendants' motion on this claim beyond pointing to testimony that he was denied certain medications. (Doc. 73 at 4). For instance, Plaintiff testified in his deposition that there were various vitamins, supplements, and prescription medications he did not receive during his time at the jail. (Doc. 69 at 9, 28–29). He also said he was sometimes denied meals he needed due to a gastric sleeve surgery. (*Id.* at 9, 29–30 ("My food was medication")). As a result of being denied medication, Plaintiff testified that he "lost weight." (*Id.* at 29).

Assuming *arguendo* that Plaintiff had an objectively serious medical need, he still has failed to show on this record that Ardeno or Updegraff either knew or should have known of an excessive risk to Plaintiff's health or safety. Plaintiff says he told "jail staff," including the jail nurse, that he was not getting certain medications or meals. (Doc. 69 at 21, 28, 30). But at no time does Plaintiff specify that either Ardeno or Updegraff personally contributed to him being denied his medication. As explained above, liability under Section 1983 demands a showing that an official acted to cause the deprivation of the right at issue. *Reed-Bey*, 607 F. App'x at 451. Plaintiff's generalization that he "told staff" that he wanted his medications does not establish Ardeno or Updegraff's requisite personal involvement. *See Shull v. S. Health Partners*, No. 3:19-CV-P412-DJH, 2022 WL 3704919 (W.D. Ky. Aug. 26, 2022) (dismissing Plaintiff's deliberate indifference claim because he did not show two defendants had a sufficiently culpable mental state when his complaint attributed actions to "several named nurse staff").

27

Concerning Dunaway, Plaintiff also contends that Dunaway "failed to fill out the appropriate medical paperwork" during his initial booking at the jail. (Doc. 73 at 2; *see* Doc. 69 at 15 ("[Dunaway] didn't fill out my medical paperwork, I didn't get my medicine right, you know, he didn't do anything properly . . . ."), 30 (Plaintiff's testimony he was told "we don't need it" when he tried to tell the booking officer about his medical needs)). For his part, Dunaway does not recall booking Plaintiff. (Doc. 60 at 26). But even assuming Dunaway was the booking officer, it is difficult to find that a reasonable officer in Dunaway's position would have understood Plaintiff's medication needs subjected him to an excessive risk of harm simply from Plaintiff's request to fill out paperwork. *Cf. Trozzi v. Lake Cnty.*, 29 F.4th 745, 759 (6th Cir. 2022) ("Trozzi testified that she had asked Stakich for her prescription medication. But that fact alone would not have alerted a reasonable officer that Trozzi used the medication to prevent ulcers or that her inability to take that medication had caused an ailment requiring emergency medical care."). Notably, Plaintiff does not argue otherwise. (*See generally* Doc. 73). There is no evidence, for example, that Plaintiff was in obvious medical distress during the booking. And even if filling out the medical form was a standard jail procedure that Dunaway did not follow, "a failure of prison personnel to follow institutional procedures or policies may show negligence but does not give rise to a constitutional claim." *Cook v. Daviess Cnty. Det. Ctr.*, No. 4:22-CV-P48-JHM, 2023 WL 8004874, at *10 (W.D. Ky. Nov. 17, 2023) (citing *Sandin v. Conner*, 515 U.S. 472, 481-82 (1995)).

What's more, the jail provided Plaintiff with some of his medications and meals after his doctor faxed his prescriptions to the jail nurse. (*See* Doc. 69 at 9 (concerning receiving his medication and meals, Plaintiff's testimony that "[s]ometimes they did, sometimes they didn't" distribute them properly), 28–29 (Plaintiff's testimony he was provided with blood pressure medication and Seroquel, but he was denied trazodone, hydrocortisone, levothyroxine, prazosin,

allopurinol, a cyanocobalamin shot, a vitamin D2 supplement, and a testosterone shot), 30).  But on this record, anything Plaintiff did not receive is not attributable to Dunaway.  Again, Plaintiff merely asserts "they" or "staff" denied him his medications and meals.  (*Id.* at 28–30).  As previously explained, this is not enough to make Dunaway personally liable.

In sum, Plaintiff has not set forth specific facts showing that there is a genuine issue of material fact that these three Defendants were deliberately indifferent to his serious medical needs.  Accordingly, the Court **GRANTS** Dunaway, Updegraff, and Ardeno summary judgment on these claims.

### C.      State Law Claims

Defendants also move for summary judgment on Plaintiff's state law claims: assault, battery, and the intentional infliction of emotional distress (IIED).  Defendants contend they are afforded immunity for all of these claims under Ohio Revised Code § 2744.  They also argue these claims fail on the merits.

At the outset, the Court notes that it may exercise supplemental jurisdiction over a plaintiff's state law claims if those claims and the federal claims derive from a common nucleus of operative fact.  *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).  Plaintiff's state law claims are based on the same nucleus of operative facts as his federal law claims already discussed.  (*See* Doc. 2).  Therefore, supplemental jurisdiction is proper, and the Court considers both of Defendants' grounds for dismissal of these claims, starting with immunity and then the merits.

#### 1.      Immunity

Defendants argue that Dunaway, Updegraff, and Ardeno are all shielded by statutory immunity for assault, battery, and the intentional infliction of emotional distress under Ohio

Revised Code § 2744.03. (Doc. 70 at 14–18). In relevant part, this statute provides that employees

of a political subdivision are immune liability in a civil action unless one of the following applies:

> (a) The employee's acts or omissions were manifestly outside the scope of the
> employee's employment or official responsibilities;
> (b) The employee's acts or omissions were with malicious purpose, in bad faith, or
> in a wanton or reckless manner;
> (c) Civil liability is expressly imposed upon the employee by a section of the
> Revised Code . . . .

Ohio Rev. Code §2744.03(A)(6). Plaintiff contends Defendants are not entitled to immunity

because the second of these exceptions—the employee's acts or omissions were with malicious

purpose, in bad faith, or in a wanton or reckless manner—applies to Dunaway, Updegraff, and

Ardeno. (Doc. 73 at 16–19). Importantly, "[w]hile a political subdivision employee's entitlement

to immunity is ordinarily a question of law, whether there exists malice, bad faith, and wanton or

reckless behavior are generally questions of fact to be resolved by the jury." *Spitulski v. Bd. of

Educ. of Toledo City Sch. Dist.*, 90 N.E.3d 287, 293 (Ohio Ct. App. 2017). Summary judgment

may be granted only "where the record lacks evidence demonstrating that the political subdivision

employee acted in such a manner[.]" *Id.* Additionally, "[t]he Sixth Circuit has held that in the

context of excessive force claims, state law claims for assault and battery 'rise and fall with the

federal excessive force claims.'" *Williams v. Collins*, No. 15-CV-337, 2017 WL 1196114, at *7

(S.D. Ohio Mar. 31, 2017) (citing *D'Agastino v. Warren*, 75 Fed.App'x. 990, 995 (6th Cir. 2003)).

Mirroring Plaintiff's excessive force claims, the Court considers Plaintiff's allegations

related to handcuffing, escorting, and the use of force incident in the jail hallway. As explained

above, there is a factual dispute as to whether Dunaway and Ardeno used objectively unreasonable

force in violation of Plaintiff's clearly established rights when they escorted him around the jail.

There is also a factual dispute as to whether Dunaway and Updegraff used objectively

unreasonable force in violation of Plaintiff's clearly established rights related to the hallway

incident.  Based on these disputes, a reasonable jury could find that the officers acted with malicious purpose, in bad faith, or in a wanton or reckless manner that would put them outside of the protection of state immunity.  *See Martin*, 712 F.3d at 963 ("As resolution of the state-law immunity issue is heavily dependent on the same disputed material facts as the excessive-force determination under § 1983, the district court properly denied summary judgment to the officers on the estate's state-law claims."); *Dresher v. Lucas Cnty.*, No. 3:15-cv-585, 2016 WL 5338042, at *8 (N.D. Ohio Sept. 23, 2016).  In other words, these claims for immunity also revolve around a credibility determination best reserved for the jury.  And ultimately, because Defendants Dunaway, Updegraff, and Ardeno are not entitled to qualified immunity for their use of force under federal law at this stage, the same is true for potential immunity under state law.  *Williams*, 2017 WL 1196114, at *7.

   2. *Merits*

  The Court now turns Defendants' arguments as to the merits of Plaintiff's assault, battery, and IIED claims.  Plaintiff first alleges the officer's actions constitute assault and battery.  (Doc. 2).  Assault under Ohio law is "the willful threat or attempt to harm or touch another offensively, which threat or attempt reasonably places the other in fear of such contact."  *Watkins v. Millennium Sch.*, 290 F. Supp. 2d 890, 896 (S.D. Ohio 2003) (citing *Smith v. John Deere Co.*, 614 N.E.2d 1148, 1154 (1993)); *see also id.* ("An essential element of the tort of assault is that the actor knew with substantial certainty that his or her act would bring about harmful or offensive contact.").  Similarly, "[a] battery occurs when a person acts intending to cause a harmful or offensive contact, and when a harmful contact results."  *Woods v. Miamisburg City Sch.*, 254 F. Supp. 2d 868, 878 (S.D. Ohio 2003) (citing *Love v. City of Port Clinton*, 524 N.E.2d 166 (Ohio 1988)).

Defendants respond that Dunaway, Updegraff, and Ardeno cannot be liable for assault and battery, because in Ohio, "a police officer is justified at common law to use reasonable force in the course and scope of his law enforcement duties." *State v. White*, 29 N.E.3d 939, 945 (Ohio 2015). But, again, there is a genuine issue of material fact as to the reasonableness of the force all three officers used against Plaintiff. So, a genuine issue of material fact exists here too. *See Ward v. Cnty. of Cuyahoga*, 721 F. Supp. 2d 677, 694 (N.D. Ohio 2010) (finding a genuine issue of material fact exists for a plaintiff's assault and battery claims when there was a genuine issue of material fact if reasonable force was used); *Williams*, 2017 WL 1196114, at *7 (S.D. Ohio Mar. 31, 2017). Therefore, Plaintiff's assault and battery claims against Dunaway, Updegraff, and Ardeno, to the extent they are alleged for the same conduct as the excessive force claims proceeding, may also proceed.

Lastly, Plaintiff alleges that the officers' uses of force were "designed intentionally to inflict emotional distress" and caused Plaintiff to suffer extreme emotional distress. (Doc. 2 at ¶¶ 10–11). Under Ohio law, "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes serious emotional distress to another is subject to liability for such emotional distress." *Yeager v. Loc. Union 20, Teamsters, Chauffeurs, Warehousemen, & Helpers of Am.*, 453 N.E.2d 666, 671 (Ohio 1983), *abrogated on other grounds by Welling v. Weinfeld*, 866 N.E.2d 1051, 1054 (2007). Under Ohio law, a plaintiff claiming the intentional infliction of emotional distress must show:

> (1) the defendant intended to cause emotional distress or knew or should have known that its conduct would result in serious emotional distress to the plaintiff; (2) defendant's conduct was outrageous and extreme and beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community; (3) defendant's conduct was the proximate cause of plaintiff's psychic injury; and (4) plaintiff's emotional distress was serious and of such a nature that no reasonable person could be expected to endure it.

*Talley v. Fam. Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1100 (6th Cir. 2008) (citing *Ekunsumi v. Cincinnati Restoration, Inc.*, 698 N.E.2d 503, 506 (1997)).

The Ohio Supreme Court has commented that "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Yeager*, 453 N.E.2d at 671 (quoting Restatement of the Law 2d, Torts 73 (1965)) (internal quotation marks omitted). "The standard has also been described as requiring facts indicating conduct that a reasonable person could conclude is 'beyond all possible bounds of decency.'" *Wilhelm v. Knox Cnty.*, No. 2:03-CV-786, 2005 WL 1126817, at *4 (S.D. Ohio May 12, 2005) (citing *Liadis v. Sears, Roebuck and Co.*, 47 Fed. Appx. 295, 299 (6th Cir. 2002)). "For a plaintiff to prevail on such a claim there must be a showing of some guarantee of genuineness, e.g., expert evidence will prevent dismissal of a claim of intentional infliction of emotional distress." *Hunt v. City of Toledo L. Dep't*, 881 F. Supp. 2d 854, 887 (N.D. Ohio 2012).

Up front, Defendants note that Plaintiff's allegations related to this claim are sparse. (Doc. 70 at 20). Indeed, Plaintiff's complaint merely alleges "[t]he actions of the Defendants as described in paragraph 7 were designed intentionally to inflict emotional distress upon" Plaintiff. (Doc. 2 at ¶ 11; *see also id.* at ¶ 10). The paragraph referenced alleges the use of force incident in the jail hallway. (*Id.* at ¶ 7 (Plaintiff was assaulted by Defendants . . . Defendants [acted by] beating him, throwing him to the ground, hitting him in the head and eye, and causing him serious injuries including, but not limited to, a dislocated shoulder, black eye, broken toe, bruising on his ribs and back and other places on his body.")). Therefore, the Court construes Plaintiff's IIED

claim as brought only for this incident. (*See also* Doc. 74 (Plaintiff's response brief only referencing Defendants allegedly threatening Plaintiff, "slamming him into a wall[,] and throwing him to the ground" in connection with Plaintiff's emotional distress)). That said, because the Court previously found Ardeno took no part in these events other than to escort Plaintiff away from the scene, he is entitled to summary judgment on this claim.

Concerning Dunaway and Updegraff, Defendants generally argue that Plaintiff cannot raise a genuine issue of material fact for any element of an IIED claim. Substantively, they contend that Plaintiff cannot demonstrate the officers' actions were extreme and outrageous. (Doc. 74 at 15). They also argue that to the extent Plaintiff suffered "some kind of severe emotional anguish" it was not proximately caused by Defendants' actions, as Plaintiff suffered from bipolar disorder and PTSD prior to August 7. (Doc. 70 at 21 (citing Doc. 69 at 36)). They also provide an expert report which opines that "the vast majority of [Plaintiff's] psychological problems significantly predate [August 7] . . . [Plaintiff] may have experienced a transient trauma-related reaction at the time of the events [of August 7], but . . . that event likely has had minimal negative psychological impact." (*Id.* (citing Doc. 70-1 at 22)).

Plaintiff has done enough to proceed on this claim, at least as to Updegraff. As Plaintiff submits, much of this claim revolves around a credibility determination. (*See* Doc. 73 at 22). If Plaintiff is believed, Updegraff used deadly force while Plaintiff was restrained and then struck him when he was unconscious—not out of any penological need, but out of anger. (*See also* Doc. 73-2 (considering that Updegraff's actions were "driven at least in part by [his] anger due to [Plaintiff's] non-violent threats . . . .")); *cf. Burgess v. Fischer*, 735 F.3d 462, 480–81 (6th Cir. 2013) (reversing summary judgment on a plaintiff's IIED claim where an officer performed a takedown on an allegedly unresisting plaintiff who made a lewd comment, and reasoning that "one

could conclude that an officer's assault of a compliant arrestee for an off-color jibe is utterly intolerable in a civilized community."). A reasonable jury could find this rises to the level of extreme and outrageous. *Cf. Wilhelm*, 2005 WL 1126817, at *17 (finding when an officer assaulted a handcuffed individual "for mere sport" that the "average citizen on the street would find such abuse of power, conducted under the guise of governmental authority, outrageous.").

But nothing in the record suggests that Dunaway's actions rise to this same level. At most, Dunaway threw Plaintiff to the ground. Dunaway is not alleged to have used deadly force, and there is no use of force report opining that he acted out of anger. *Cf. Wilhelm*, 2005 WL 1126817, at *17 (dismissing an IIED claim against an officer who allegedly threw an arrestee against a door, to the ground, and then into a police car) ("Although perhaps excessive-and even if done in bad faith-the amount of force Carpenter allegedly used on Alva does not constitute conduct so extreme and outrageous as to go beyond all possible bounds of decency so that it is outrageous and utterly intolerable in a civilized community."); *Folks v. Petitt*, No. 1:13 CV 2292, 2016 WL 2962258, at *8 (N.D. Ohio May 23, 2016) (granting summary judgment on an IIED claim that alleged an officer forced a plaintiff's head into a windshield during an arrest, even when a jury question remained of if the force was excessive), *aff'd*, 676 F. App'x 567 (6th Cir. 2017); *Norman v. City of Lorain* No. 1:04 CV 913, 2006 WL 3337466, at *2 (N.D. Ohio Nov. 16, 2006) (granting summary judgment on an IIED claim alleging an officer forced a plaintiff's arm back to the point that it broke during an escort was not outrageous and extreme beyond all bounds of decency). Simply put, Dunaway's actions—even if excessive or in bad faith—do not rise to the level of "outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Yeager*, 453 N.E.2d at 671 (citation omitted). "While such conduct is by no means to be encouraged or held

out as exemplary, neither is it, of itself, particularly unusual or shocking." *Folks*, 2016 WL 2962258, at *8. Notably, Plaintiff's response brief does not argue otherwise. (*See* Doc. 73 at 22).

Turning to the other factors, Plaintiff finds more success as to Updegraff. Concerning the emotional distress Plaintiff suffered, Defendants correctly note that Plaintiff has provided no psychological or mental health expert report in this case to counter their own expert. But that is not always required. *Irvin v. City of Shaker Heights*, 809 F. Supp. 2d 719, 739 (N.D. Ohio 2011) (citation omitted) ("[E]xpert medical testimony . . . is not necessarily indispensable . . . . In the absence of such expert testimony, however, the Plaintiff must present some evidence in the record beyond mere allegations suggesting a serious and debilitating emotional injury to serve as a guarantee of genuineness in order to survive a motion for summary judgment."). Here, Plaintiff has supplied medical records from the Reynolds Memorial Hospital in West Virginia that he was hospitalized on August 12, the day after his release from jail, for psychological distress. (*See* Doc. 67-6). Plaintiff also testified that he's required more PTSD medication after the events of August 7 and has panic attacks when he sees police. (Doc. 69 at 30 ("I'm scared they're going [to] beat me up.")); *see Wilhelm*, 2005 WL 1126817, at *9 (considering the plaintiff's testimony that he was treated with therapy and medication and generally had general worry about an alleged assault). On this record, a reasonable jury could determine that Plaintiff's emotional distress was serious and of such a nature that no reasonable person could be expected to endure it. *See 180 Indus., LLC v. Brunner Firm Co. LPA*, No. 20-4129, 2021 WL 4955268, at *3 (6th Cir. July 13, 2021) ("Serious emotional distress may be found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case . . . . Examples include traumatically induced neurosis, psychosis, chronic depression, or phobia." (citation and internal quotation marks omitted)). What's more, though Defendants' expert opined

36

that the events of August 7 had little impact on Plaintiff psychologically, ultimately the jury is the proper body to determine who should be believed. At the very least, a reasonable jury could find the temporal connection between the events of August 7 and Plaintiff's hospitalization on August 12 speaks to proximate cause. (*See* Doc. 67-6 (Plaintiff's medical records from August 12 mentioning his five days in jail)). Accordingly, this claim is best presented to a jury.

In sum, the Court **DENIES** Dunaway, Updegraff, and Ardeno summary judgment on Plaintiff's state law assault and battery claims based on the same actions underlying the excessive force claims the Court allowed to proceed. The Court **GRANTS** Ardeno and Dunaway summary judgment as to Plaintiff's IIED claim but **DENIES** Updegraff summary judgment on the same.

### D. Defendants Lucas and the Belmont Board of County Commissioners

Next, the Court turns to Plaintiff's allegations as they relate to Defendants Lucas and the Belmont Board of County Commissioners. Plaintiff's complaint alleges that because Dunaway, Updegraff, and Ardeno were employed by Lucas and the Board and their actions were committed within the course and scope of their employment, any violative action taken by the three is also imputed onto Lucas and the Board. (Doc. 2 at ¶ 8, 20, 25).

To begin, nothing in the record indicates that Defendant Lucas or any member of the Board were personally involved in the events at issue in Plaintiff's Complaint. For this reason, Plaintiff concedes that Lucas cannot be held liable for Plaintiff's § 1983 claims. (Doc. 73 at 19). By the same logic, neither can the Board.

As for Plaintiff's state law claims, Defendants likewise contend that no member of the Board was personally involved in the alleged incidents, so they are entitled to immunity in their individual capacities under Ohio Revised Code § 2744.03(A)(6). Plaintiff did not rebut this argument. (*See generally* Doc. 73). Plaintiff also did not rebut Defendant's argument that the

Board itself is not liable in any capacity as a function of Ohio Revised Code § 2744.02. (Doc. 70 at 17–18); *see* Ohio Rev. Code § 2744.02(A)(1) ("[A] political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental . . . function."); Ohio Rev. Code § 2744.01(C)(2)(h), (x) (including the "operation of jails" and "a function that the general assembly mandates a political subdivision to person" in the definition of a "governmental function"); *cf. Est. of Parker v. Clark Cnty.*, No. 3:17-CV-307, 2019 WL 1317862, at *5 (S.D. Ohio Mar. 22, 2019) (holding a county was immune from a civil suit for damages under Ohio Revised Code § 2744.02(A)(1)). In fact, Plaintiff's response in opposition to Defendants' summary judgment motion does not mention the Board once. The Court can only conclude that he has abandoned his claims against it. *See also* Fed. R. Civ. P. 56(e).

Defendants finally contend that Lucas is not liable in any capacity for Plaintiff's state law claims. (Doc. 70 at 17). In particular, they argue that because Lucas was not personally involved in the allegedly tortious actions, he is entitled to immunity under the Ohio Revised Code § 2744.03(A)(6) as a county employee. (*Id.*); *see Coley*, 799 F.3d at 542–43 ("Federal courts have held that sheriffs and sheriff's deputies are considered employees of the county, which is a political subdivision of the state."); *see also Myers v. Montgomery Cnty. Bd. of Comm'rs*, No. 3:18-cv-00409, 2019 WL 2567748, at *10 (S.D. Ohio, 2019) (dismissing claims against a sheriff because he was entitled to statutory immunity under Ohio Revised Code § 2744.03(A)(6)). The only relevant counterargument Plaintiff offers is his contention that Lucas can nonetheless be held liable for Plaintiff's state law claims under the doctrine of respondeat superior. (Doc. 73 at 19). In other words, Lucas is vicariously liable for his officers' actions because their allegedly tortious conduct was committed within the course and scope of their employment.

38

Plaintiff cites two cases to support this theory. In both, Ohio courts discuss the availability of respondeat superior liability for employers or supervisors of correction officers. *See Thomas v. Ohio Dep't of Rehab. & Corr.*, 548 N.E.2d 991, 993 (Ohio. Ct. App. 1988) (finding a prison superintendent liable under a theory of respondeat superior for a corrections officer's tortious conduct); *Jodrey v. Ohio Dept. of Rehab. & Corr.*, 2013-Ohio-289, 2013 WL 407471, at *2 (Ohio Ct. App. 2013) (finding ODRC not liable for a correction officer's tortious conduct because the conduct occurred outside of the scope of employment). But in each case, the state waived its immunity and consented to be sued in the Ohio Court of Claims under the Ohio Revised Code § 2743.02. *Thomas*, 548 N.E.2d at 993; *Jodrey*, 2013 WL 407471, at *2. No such waiver exists here. *Cf. Gilliam v. Crowe*, 2017-Ohio-5494, 2017 WL 2729620, at *5 (Ohio Ct. App. 2017) (dismissing a claim that a sheriff was liable under the doctrine of respondeat superior for the tortious conduct on his employee and finding he was entitled to immunity as a political subdivision employee). Plaintiff does not otherwise argue that an exception to Lucas's immunity exists. Therefore, to any extent Lucas can be held liable for the events discussed in the Complaint, he is entitled to statutory immunity.

Accordingly, the Court **GRANTS** summary judgment to Lucas and the Belmont Board of County Commissioners for all of Plaintiff's federal and state claims against them.

### E.     Punitive Damages

The final claim for which Defendants seek summary judgment is Plaintiff's claim for punitive damages against all Defendants. In their Motion, Defendants argue that punitive damages are not available as to the Board or Lucas under Ohio law. (Doc. 70 at 22 (citing Ohio Rev. Code § 274.05(A) and the fact Lucas was not personally involved in the events at issue)). Plaintiff failed to challenge this argument. (*See generally* Doc. 73). Moreover, the Court concluded that neither

Defendant is liable for any of Plaintiff's federal or state claims.  Therefore, the Court **GRANTS** the Board and Lucas summary judgment on this claim.

Defendants also argue that Dunaway, Updegraff, and Ardeno cannot be found liable for punitive damages because they did not act with malicious purpose, in bad faith, or in a wanton or reckless manner.  (Doc. 70 at 22, citing *Range v. Douglas*, 878 F.Supp.2d 869, 896 (S.D. Ohio 2012)).  But as explained above, the Court finds there is a genuine issue of material fact as to the officers' mental state—whether Dunaway, Updegraff, and Ardeno acted with malicious purpose, in bad faith, or in a wanton or reckless manner.  Though Plaintiff does not address this claim in his responsive brief, the Court finds the interest of justice weighs in favor of allowing this claim to proceed.

Accordingly, the Court also **GRANTS** Defendants Lucas and the Board summary judgment as to Plaintiff's claim for punitive damages but **DENIES** Defendants Dunaway, Updegraff, and Ardeno summary judgment for the same.

### F.    Trial Schedule

Lastly, the Court imposes the following trial schedule:

- The parties shall participate in a final settlement conference before the Court on January 28, 2025.  Counsel and the parties shall appear in person at 10:00 A.M. at the Joseph P. Kinneary United States Courthouse, 85 Marconi Boulevard, Columbus, Ohio 43215 in Room 200.  Mediation statements shall be submitted to the Court by January 21, 2025.

- The parties shall file witness and exhibits lists, witness statements, and deposition designations on or before February 10, 2025.

- The parties shall file any pre-trial motions, motions *in limine*, stipulations, joint jury instructions, and proposed supplemental jury instructions on or before February 24, 2025. Any responses or objections are due by March 3, 2025. No replies will be permitted without leave of Court.

- The final pre-trial conference in this matter is **SET** for March 10, 2025. Counsel shall appear in person at 10:00 A.M. at the Joseph P. Kinneary United States Courthouse, 85 Marconi Boulevard, Columbus, Ohio 43215 in Room 200. The parties shall prepare and file a joint proposed final pretrial order prior to this conference.

- The parties shall deliver one tabbed exhibit binder to opposing counsel and three tabbed exhibit binders to the Court on or before March 13, 2025, at 4:30 P.M.

- Trial in this matter is **SET** to begin on March 18 at 9:00 A.M. at the Joseph P. Kinneary United States Courthouse, 85 Marconi Boulevard, Columbus, Ohio 43215.

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS in part and DENIES in part** Defendants' Motion for Summary Judgment (Doc. 70). These claims will proceed forward:

1.    Plaintiff's Fourteenth Amendment excessive force claim related to escorts against Defendants Dunaway and Ardeno;

2.    Plaintiff's Fourteenth Amendment excessive force claim related to the jail hallway use of force incident against Defendants Dunaway and Updegraff;

3.        Plaintiff's state law assault and battery claims based on the same conduct described in #1 and #2 against Defendants Dunaway, Updegraff, and Ardeno;

4.        Plaintiff's intentional infliction of emotional distress claim against Defendant Updegraff; and

5.        Plaintiff's claim for punitive damages against Defendants Dunaway, Updegraff, and Ardeno.

Defendants are **GRANTED** summary judgment for all other claims.  As the Court has granted summary judgment for all claims against Defendants Lucas and the Belmont Board of County Commissioners, both parties are **DISMISSED** from this action.

The Court lastly **SETS** this case for trial on March 18, 2025, at 9:00 AM.

IT IS SO ORDERED.

Date:  December 12, 2024                /s/ Kimberly A. Jolson
                                            KIMBERLY A. JOLSON
                                            UNITED STATES MAGISTRATE JUDGE